Next matter is Avandia. I would like to reserve five minutes for rebuttal. Thank you. Your Honors, the defendant Glaxo here manufactures the prescription drug Avandia. You know, we know the facts. What is the strongest argument for you? We can't rely just on the statutory text because that doesn't help. At least I don't think it helps you. The issue with the regulation is whether or not the regulation is supported by the statutory text or is beyond it. And then we've got the 28-J letter that was submitted that is basically just the agency saying we believe in what we did. The regulations that we promulgated are nothing wrong with them. I'm not sure how much that helps you. So what's your strongest argument? Strongest argument, Your Honor, is that 1395YB3A, the private cause of action, is non-restrictive and non-exclusive. It's a private cause of action to recover payments from a primary payer that is not honored. It's Medicare secondary payer obligation. But isn't it all about the powers and the authority of the Secretary? No, Your Honor. It's a private cause of action by its very title and by its very terms. Oh, okay. I see what you're saying. The Secretary. And that private cause of action existed way before the MSP or the MAO came into existence under. It was enacted before the Medicare Advantage statute. That is correct. But Congress is presumed to be aware of what it has drafted when it drafted the MAO section. Notably, when Congress enacted the Medicare Advantage statute in 1997, if you look at the House Conferees Report that we put in our brief, they said that it was meant to be a clear statement. And they specifically said with respect to reimbursement, it was supposed to be a clear statement that Medicare Advantage organizations' rights would be the same as the Secretaries or equal to the Secretaries. They also, when they crafted 1395W22A4, which is Medicare Organization as Secondary Payer, an organization, of course, refers to a Medicare Advantage organization. They specifically cross-reference to the Medicare Secondary Payer Act, and they'd say that the organization may charge the primary plan. Now, to adopt Glaxo's. Yeah, but that, I'm not sure, that simply, it seems to me, allows someone in the position of your client to get reimbursed from the party that was primarily responsible for the money that that primary party should have paid but didn't pay for whatever reason, so the secondary payer was on the hook, and so the secondary payer can be made whole. But if that's your authority, I think you'd agree that the money that the secondary payer would derive under that authority would not go to the trust fund. It would go right back to the pocket of the secondary payer. Oh, but I disagree, Your Honor. It would go to the trust fund? Yes, we have it in our brief. Not all of it goes to the trust fund, but it does affect the trust fund, and Congress was aware of that, and CMS is aware of that. Well, when you say affect the trust fund, that's different than going, it would affect it because of the capitation rate. Because of the capitation rate and also because of, we describe in there a true-up where monies get 75-25 above a certain level back to the beneficiaries of the Part C plans. That's on the bid. That's on the bid that they bid for the capitation, all right? Correct. Okay. Okay. I mean, that's an up-front question. I don't see that as a back-end question. Well, but the determinant is not whether the money goes directly back to the Treasury or indirectly back to the Treasury. The Treasury is affected derivatively, and that perhaps explains Congress's intention of giving Medicare Part C advantage organizations the right to claim secondary payments. 22A4 is deprived of all meaning if you don't allow the Medicare Advantage organization to collect that for which Congress says it may charge. Mr. Cohen, let me ask you another question that might be helpful to your position. As I understand Part C, I mean, Part C is for the Medicare Advantage plans and other plans that aren't before this Court today. But they're really just another form of Parts A, B, and D. It's sort of a hybrid of the others. I would say Part C in Medicare is a hybrid of the others. In your 28J letter, which includes the updated direction from the trust fund, it talks about assigning the director's rights. Why have you not hit that point a little harder? Assigning, I'm sorry, that, you sent the 28J letter, it talks about the second paragraph of the letter from CMS, says that these regulations also assign the right to collect for those services to MAOs. Yes. Okay. And the amicus refers generally to that question. Why wouldn't, basically what I'm asking is why wouldn't Umana be in the shoes of the director? They are, Your Honor. Okay. They are. And the question I would have is. I can explain that. The trust fund says they're assigning it. Statutorily, do they have the right to assign it? It's a clumsy use of the term, Your Honor. What happens is. We should have the term assigned? Yes. What happens, Your Honor, is that, and this is what Glaxo has been doing in the Evandia case. Whenever they settle with someone who's covered under Medicare A or Medicare B, they scrupulously honor and reserve the amount of the Medicare lien, and they report it to CMS. Now, under Medicare C, the same procedure is supposed to apply. They're supposed to report it to CMS, and CMS alerts us. They're not doing it. They somehow feel that the happenstance of whether a settling Evandia claimant is covered under A or B or under C is a free ticket. It's like a practical joke. So if that lien's reserved out there, your argument is someone has a right to go after it. Yes. And that's your clients. Yes, Your Honor, and W22A4 says that we have that right. And the private, we are the first, this is the first case to come before a federal appeals court questioning whether 1395YBA, it means what it says. It's a private cause of action. We are a private party. We have identified a Medicare primary plan that has not honored its Medicare secondary payer obligations. We have the right to bring that claim. There's nothing in 1395YB3A that excludes us. And you have to graft language into there. It cuts both ways. Nothing specifically excludes you. Nothing specifically includes you except for the term private cause of action. And you're, I guess, arguing that that would clearly not be a description that fits an action brought by the Secretary. Correct, Your Honor. Moreover, if it's, well, what did Congress mean? Well, we can always resort to CMS, which has been expressly delegated by Congress to interpret the Medicare Act. And CMS has come out quite plainly in CFR 422-108F saying we have rights tantamount to those of the Secretary to recover secondary payments. The statute makes no sense if we don't have that right. I guess, though, and I said I'm trying to help you here in this argument, you're trying to go to YB3 and articulate that the statute gives you a private right of action. What I was saying was why not go to YB3I and say where it says an action by the United States and the action by the United States was assigned to you? Why wouldn't that cover what you need? I could, Your Honor, and CMS says that. Well, I've argued that. CMS says that. I didn't feel I needed to go beyond the clear terms of YB3A. I think you do. But I thank you, Your Honor. That's why you're not clear. Because CMS says that we have that right, specifically the right you just identified. And the Court should defer to CMS on that. Well, I'm not sure. We have to determine whether or not CMS has the right to say that you have that right. But what possible – it's not my job to ask the Court questions. But without a remedy, you've rendered W22A4 meaningless. They're flouting it. They're laughing at us. It's a practical joke. Congress gave us the right to bill to charge for these secondary payments, the right specifically to charge a primary plan, which is defined in the Medicare Secondary Payer Act, to include a self-funded tortfeasor like Glaxo. And yet somehow we don't have – it's voluntary on their part. We have no right to prosecute the charge. We are saying we do have the right to prosecute the charge. 1395YB3A is there. You have to graft language into it to find an exclusion for us. If you didn't take the interpretation that you're asking us to have, that would mean that you would become involved in an enterprise that at its outset would mean you'd be losing money. Yes. How does this work in reality? Not in this case. This is not your typical primary, secondary payer case. But let's say you have a typical situation with two insurance companies on the hook, and you're the secondary payer. Great question. I assume you do not sign any contract with the primary. It only comes up in these mass tort settlements. You have someone who gets into an auto accident, breaks a leg, goes to the emergency room. We get the claim. Someone has a broken leg, we're immediately on alert to go make the inquiries to find out the circumstances of the accident and identify a primary plan. Someone over 65 has a heart attack or a stroke, that's not a red flag to go look for all the drugs he took, all the products he used. It's not something that comes to our attention for an investigation for a primary plan. However, when Glaxo announces that they're settling 10,000 Avandia suits for $3 billion and they're reserving for the government's liens, now we're certainly alerted and we've come in and asked them to identify and take care of the Medicare C liens. It shouldn't matter whether the settling claimant is under A and B or under C. That happenstance should not affect the outcome of whether the primary plan has to reimburse the secondary payer. Thank you. Is it Zimitis, is that correct? Zimitis, Your Honor. Zimitis, okay. Yes. May it please the Court, my name is Thomas Zimitis and I'm here representing FLE Glaxo SmithKline LLC. Excuse me. I know you don't agree with what Mr. Cohen said, the statute says, but would you go so far as to agree just strictly for hypothetical purposes that if the statute does not say that, wouldn't it be a lot healthier system if it did say that? No, because the statute doesn't need to provide a private cause of action under the Medicare Act for double damages, which is what Humana is looking for, in order for Humana to be able to enforce its rights. You just, Judge McKee, gave the paradigm situation where there are two competing insurance plans and one of them is a Medicare Advantage plan and therefore secondary. That is something that is common in the industry. It's common from a mass tort case down to a simple automobile accident. Well, how does the secondary reimburse them? Because the secondary doesn't sign a contract with the primary. No, but they sign a contract with the insured, just as Medicare organizations sign contracts with their insureds. It's interesting to note, I think, that in the Parra case, which we cite in their brief, the section of the plan in that case that deals with relationships for reimbursement by the insured and rights of subrogation on the part of the insurer is five pages long. Not a single word of that comes out of Medicare or requirements that Medicare imposes. It's that particular health plan's way of dealing with its right to charge, which is all that Congress gave Medicare Advantage organizations, and it deals with it by contract and by typical procedures under state law. But in the practical sense of this, are you saying that the secondary payor would be made whole by the beneficiary paying the secondary payor? It can happen either way. Remember, the charging section in Part C permits the Medicare Advantage organization to go after the would-be primary payer or the beneficiary if the beneficiary receives payment. So it's possible to go either direction. Remember, there are rights of reimbursement from the individual insured. There are rights of subrogation to take that insured's rights and carry it forward. I'm not suggesting that they would or should, but they can. They have to. No. No. They can exercise the right. If they have no cause of action against you, where else would they go? They have subrogation rights, and they can stand in the shoes of their insured and sue a primary payer. And what the charging section does is ensure that a state can't take that away from a Medicare Advantage organization. Why can't they stand in the shoes of the secretary? Again, that would seem to make this whole system work a lot better. I know it's not our job to fix the system. Congress could have provided for that, but it didn't. And it's interesting. Well, Mr. Cohen is saying it did. Well, no, I don't think that's what. And CMS is saying it did. Well, no, CMS has not talked about whether there's a private cause of action under the Medicare Act. CMS has talked about rights, not causes of action. And they're very distinct issues. The Sandoval case. Well, doesn't the right give rights? It's hard to have a cause of action without a supporting right. And if you have a right with no cause of action, that's a right that I think very much would not carry that much to injury. I appreciate that. They say they're going to assign the right and the responsibility. Well, the right and the responsibility is not the cause of action. The rights, Federal rights are often vindicated in State court actions. The Supreme Court couldn't have been more clear in the Sandoval case, which was exactly such a case, where the courts said that statutory rights did not equate to a cause of action, and that we as a court must be very clear that only Congress creates rights of action. But they already had the right that you're talking about. They have a right. They had that in any event. Your Honor, they no, that's. They had a right, didn't they? No, that's exactly the point. Didn't they have a contract killing? They didn't. And that's, I mean, what the concern that I think is worn out in the charging section of Part C is that State law was intervening and saying, wait a minute, we have a personal injury protection law which makes it secondary, so that trumps your right. Congress wanted to make crystal clear that Medicare Advantage organizations have a right to charge. It's a Federal right. It cannot be taken away by the State. Okay. But that doesn't equate to a cause of action for double damages as a private party. And this is a very narrow case. The issue isn't what Humana's rights may or may not be. The issue is, can those rights be vindicated in a private cause of action under the Medicare Secondary Payer Act for double damages? What about Judge Fischer's question to Mr. Cohen? Who collects the lien? When the lien is put on the reserve fund under the terms of this settlement and you've got a bunch of settling claimants who are covered under Part C and not by Medicare under A or B, then who gets the liens that are put on by the Part C claimant? A couple answers by that. There's no, you can't put a lien on something that doesn't exist. And you have to understand. And this comes right out of CMS. In the context of a tort claim where there's a settlement, the primary payer does not become a primary payer until the funds are available. In other words, until the settlement payment's made. So this notion that Humana can come after us for cases that haven't settled and learn lots of information about them isn't even supported by CMS. Yeah, but that's a different issue. Let me talk about practically what happens. All right. It's one thing dealing with CMS because GSK can submit information to CMS, say, is this person someone who receives benefits under Part A and Part B? The answer comes back yes because there's that communication. We can reserve for that person. And we do. Any satisfaction of private insurers, whether it's a Medicare Advantage organization or simply a private health benefit policy has to be voluntary. It has to be voluntary on the part of GSK, on the part of the individual settling plaintiff, and on the part of the insurance company. We are endeavoring to create voluntary lien resolution programs. They exist in the context of the Advantia settlement, and they've existed in the context of other mass tort settlements. The Vioxx case is a particularly good example. And in those instances, and indeed I will tell you, many of the Medicare Advantage organizations have elected to participate in those voluntary lien resolution programs. We're not thumbing our nose at anybody, Your Honor. We're not hiding from a responsibility. We're trying to execute it. But it's not in the same context as government liens where there are recognized avenues and recognized responsibilities to be able to resolve those liens. So GSK is not shying away from satisfying the liens. And indeed, if a Medicare Advantage organization or a private insurer says to GSK, here's somebody who we insure, who we believe we've made payments on behalf of, that you should have paid. If we get that information and we settle with that individual, we reserve. If YB3A doesn't apply in this situation, what situation would it apply in? Yeah, the case law is really very clear on this. And the Stolle case out of the Eighth Circuit, I believe it is, describes quite well what the responsibilities are. Well, you know, the Stollings, there are a bunch of Stollings cases. I can't support anything against the Catholics. Yes. I'm sure anyone against the Methodist Church. But the whole issue there is whether or not we're dealing with a qui tam statute. And why isn't everything that is said in the Stollings cases dictated? There's some very helpful language in there for you, but it's all dictated. But the Stollings cases do talk, particularly the Eighth Circuit case talks about the rationale behind the private cause of action and what Congress was intending to do. First of all, Congress concluded that parties who receive benefits or who provide benefits and get reimbursed are more likely to be aware of a primary payer situation than Medicare. Now, in this context, I'm not sure that's true. But at the time that the MSP was enacted, that was the first principle. The second was, unless Congress gave a right to recover double damages, there wouldn't be any incentive for the private party to go after the primary payer. Isn't that part of their argument with regard to why you have MAOs to begin with? I mean, what would be the advantage of getting into the business as an MAO if you weren't able to make a recovery as they're suggesting? But you are able to make a recovery, just not under this section, Your Honor. I can't be clearer about that because it is the double damages provision for someone like Humana doesn't fit. At the end of the day, if Humana were required, and it says it's not. I mean, it argued, well, there's this relationship between what we would recover and the capitation payment, not very well articulated. But what's the one thing that is crystal clear, and Humana doesn't argue to the contrary, is that Humana does not have to repay any of the so-called debt recovery that it claims to be entitled to. It gets to keep it all. So it's made more than whole if this applies. And what I think is interesting, as much as Humana relies on the private cause of action, the language in that section, they say, hey, we're a private party. We're seeking to recover from a primary payer. That's enough. It's not enough. How does the double damage provision, what's the policy motivation and the reasoning as far as it applies to the Secretary? Well, the Secretary, I think there's a different rationale there. I think the rationale there is to encourage payment, primary payers to make payments. Right. Well, why wouldn't that same rationale apply to Humana? It may, but it's only part of the rationale. I mean, you know, and again, remember, Humana is arguing that it's a private party and it seeks a private cause of action. But don't you need to draw a distinction? Because if you don't draw a distinction in those two situations, you know, in one situation you're saying, well, double damages may make sense, but in Humana's case it definitely doesn't make sense. I mean, isn't the statute there essentially to induce compliance? But Congress is the party that resolves those policy issues. And Congress has resolved it in the way it crafted Part C. I'm not sure that answers the question. If the double damages are there to induce compliance, and it's hard to argue that that's not the motivation, or at least one of, and perhaps the primary motivation for allowing for double damages, again, it seems like that same motivation would be equally at work whether or not it's a secondary payer bringing the claim vis-a-vis Humana or whether it's the Secretary. That aspect of it, I agree, Your Honor. You could argue that it applies equally. But the ultimate arbiter of whether or not that results in MAOs getting that private cause of action. And, again, that would be the government's cause of action, not the private payer's cause of action. That puts it back under the hat, because we're trying to figure that out. I mean, there's a little bit of, you know, we're sort of arguing both sides here. I mean, Humana says we like to be like the Secretary, but we're a private party and we want the private cause of action, and it's an uncomfortable fit. But at the end of the day, it's Congress's decision as to whether or not whatever the factors that support the double damages recovery. And I think we view that, we're trying to figure out what the heck Congress decided. Well, I think it's – I think Congress was pretty clear. Congress would not – both in the positive and in the negative. In the positive, Congress – That's usually the way they're pretty clear. It's what Congress said and what Congress didn't say. Maybe I didn't articulate that clearly. But what Congress said is MAOs get the right to charge. It did not incorporate by reference the private cause of action or the government cause of action in Part C. So that's what Congress said. And what didn't Congress say? Well, Congress did not incorporate by reference. Congress knows how to do it. I mean, there's a section, and it's actually quoted by plaintiffs – or by Humana in its reply brief, which deals with the rights of an MAO beneficiary to bring claims before the Secretary and before the – appeal those claims. And I just – I think it's so telling, the differences, that I think it's worth spending a moment to present it to you, if I can find it, which I should be. Okay, while you're looking – Sure. I want to go back to your subrogation point. I think what you said – and correct me if I'm wrong – is that the primary manner in which you foresee Humana recovering, because you said they have an opportunity to recover, is through subrogation. Now, is – so in the situation that's occurred here where you've – would you anticipate Humana standing in the shoes of the enrollees and then engaging in settlement discussions in that way? I'm not understanding how subrogation would solve the issue here. Not in this context, because in the context of a settlement – and as I said, we're trying to engage all the interested parties, including Medicare Advantage organizations, some of which are participating. No, I think in that context, it's going to come out in – the settlement is going to deal with the various issues and claims that may exist there. The problem with – double damage is going to make the process more difficult. There's no question that if there are – if some organizations or some insurers or some of their beneficiaries have a claim for double damages, it's going to disincent individuals. I get that, but subrogation – I just want to understand your subrogation point, because it doesn't make sense. My subrogation point occurs in the more classic context that Judge McKee was talking about. In the context of a mass tort settlement, there's going to have to be a method to deal with the potential for Medicare C claims. If it's not dealt with in the settlement, either the beneficiary or the settling defendant has the risk of liability. And that could be – if the – once the payment is made in settlement to the individual plaintiff, then the plaintiff has received what it's entitled to receive by definition because that's what a settlement does. And then it's up to the plaintiff and the MAO to resolve that. If the MAO chooses to go against the primary, they could. They could say we're standing in the shoes of the individual plaintiff. But that's not going to happen in the context of these cases. Where does that right come from? Excuse me? You just said if the secondary chooses to go against the primary, stand in the shoes of the settling plaintiff, they could. Where does that right emanate from? Well, I think that's a right under state law. I mean, that's a process under state law. But what state law can't do is, in that process, take away from the Medicare Advantage Organization the right to recover from the primary payer. Okay. Thank you very much. Mr. Komen? Your Honors, I heard Mr. Zemedis, but we can't enforce our rights in the way he suggests, this subrogation analogy. And you just have to look to the Baxter decision from the Eleventh Circuit to see why. We don't even learn about these settlements, and we only learn about them generically after the fact. And even then, they're not disclosing who they're paying to, and the insurance, the mass tort lawyers are hiding the ball from us as well. So we can't get our toe in the door. The Baxter decision lays this out perfectly and describes this exact situation where you have the tort feeser, a pharmaceutical company, or they're a device company, and the mass tort bar saying, let's not let Medicare in the door. Now, there it was the government Medicare, and they were forced to let them in the door. But here it's the same principle for Medicare secondary payer. Now, Mr. Zemedis says, well, we still have the right to go into state court and pursue subrogation. I'll remind the bench that this is a CAFA class action, and if we have the right to do that in state court, we have the right to do it in federal court. We met all the jurisdictional requirements of CAFA. Humana has sued on its own behalf and on behalf of other Medicare advantage organizations. So the jurisdictional argument, whether it's state court or federal court, cannot be dispositive here. We're either out on 12B6 or we're not. And respond to his double damages argument and his argument that it's inherently inequitable? Perhaps it is, Your Honor, but we didn't make it up. Congress did. It's in the Medicare secondary payer act. You hit right on the nose the purpose for it, which is to get the Medicare cheats to not cheat. It's pay up at the time of the settlement, and you only pay your reimbursement share. Now, to the mass tort bar, that's anathema because it reduces the size of their settlement and the size of their fees. To Glaxo, they've made a judgment, I guess, that they'd have to probably pay more to settle these cases if they took care of the Medicare C liens. They realize they've got to do it with A and B, and they've taken a position that the happenstance of someone being covered under C gives them a free pass. So Glaxo says it's unfair. They say the compliance is voluntary. W22A4 says it's certainly not voluntary. And the Medicare secondary payer act says it's certainly not voluntary. And CMS says it's certainly not voluntary. And CMS, yes, Judge Fischer, you're correct. CMS says we have all the rights of the secretary, and if all else fails, we should be able to exercise those rights. If we're the government, we have the government's rights, and CMS says so. If we're a private payer, then we have the right under YB3A. But we must have the right to enforce this Medicare secondary payer collection right that Congress has specifically given for all payments under this title. And then went further when it created the Medicare Advantage Act, just in case anyone was confused, to confirm in W22A4 that, yes, indeed, Medicare Advantage organizations are secondary payers in the circumstances described under YB2, which is the Medicare secondary payer act. I don't think that's an issue, really. I think the issue is what does that get you? I think everybody agrees that you're a secondary payer under the act. The issue is whether or not that gets you the remedy that you're trying to seek under YB2AB. Well, Your Honor, we're either a private party or the government. So under either or, we have a right of action. Well, but the private party, the private party cause of action they're saying you have, obviously, is the contractual suit in state court. Well, if we can sue in state court, then we can bring the same claim in federal court. But think about it. What would we be suing for in state court? We'd be suing for our rights as set forth in W22A4, federal statute. It still comes back to a federal claim. The – I lost my train of thought. Oh, Your Honor, you said, you know, I watched four top lawyers up at the – while I was sitting there all say the same thing. Essentially, we're trying to figure out what Congress meant. Well, if you can't figure out what Congress meant, Congress delegated in 1395 H.H. Whatever, I know. Yeah, whatever. H.H.M.M. They delegated the authority to the Centers for Medicare Services to interpret this act because, as another panel of this court said a little more than a year ago in the Cooper case, it's one of the most impenetrable acts ever devised by man. So we acknowledge that it's dense. And we've taken you on the road through the Medicare Act, the Medicare Secondary Payer Act, and the Medicare Advantage statutes, and we believe we've shown that all the points click. If we're still confused, let's defer to CMS, which has specifically said we have the same rights as the Secretary. Okay, Mr. Cohen, thank you very much. Again, very excellent argument. Maybe the statute is still impenetrable, but both of you gentlemen today have helped us, I think, trying to figure out what the heck Congress said and what they intended when they said whatever they said. Thank you very much for your time. Give it a five-minute break, and then we'll take the last two minutes. Thank you, Your Honor.